In the Matter of BALDWIN UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.

Bankruptcy No. 1–83–02495.

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 19, 1984.

See also Bkrtcy., 36 B.R. 401; Bkrtcy., 38 B.R. 802.

Robert J. White, Richard G. Parker, O'Melveny & Myers, Los Angeles, Cal., for debtors.

Peter Wolfson, Claude Montgomery, Marc Richards, Booth, Marcus & Pierce, New York City, for Shareholders' Committee.

Rodney Ray, Knoxville, Tenn., for Federal Deposit Ins. Corp.

Thomas Anderson, Freytag, Marshall,. LaForce, Rubinstein, Stutzman & Teofan, Dallas, Tex., for Arkansas Ins. Comr.

David F. Snow, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Ameritrust. ·

Eric J. Wallach, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for J. Henry Schroder Bank & Trust Co.

Irving Harris, Porter, Wright, Morris & Arthur, Cincinnati, Ohio, for Friends of the Fine Arts Trust.

Gregory R. Wilson, Katz, Teller, Brant & Hild, Cincinnati, Ohio, for Chemical Bank.

James R. Bridgeland, Jr., Taft, Stettinius & Hollister, Cincinnati, Ohio, for Former B–2 Debenture Holders.

Mark Wallach, Calfee, Halter & Griswold, Cleveland, Ohio, for First National Bank of Chicago.

Gregory Meurer, Shaffer & Meurer, Cincinnati, Ohio, for George Strike.

FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW Re: DISPOSITION OF D.H. BALDWIN'S CLASS 2 LIMITED PARTNERSHIP INTERESTS IN CENTRAL COLORADO COMPANY

RANDALL J. NEWSOME, Bankruptcy Judge.

These Chapter 11 cases are before the Court upon the Debtors' July 27, 1984 mo-

tion to dispose[1] of certain partnership interests which debtor D.H. Baldwin Co. ("DHB") holds in Central Colorado Company, and for an order authorizing the compromise of certain claims. Memoranda in opposition to this motion were filed by Linda Garner, Insurance Commissioner for the State of Arkansas; the Common Stockholders' Committee ("Shareholders"); the J. Henry Schroder Bank & Trust Co. ("Schroder"), a successor indenture trustee for holders of Baldwin-United Corporation 9¼% subordinated installment notes due in 1994 and 10% subordinated debentures due in 2009; and the Federal Deposit Insurance Corporation (referred to collectively as "the Objectors" hereafter).

Both the DHB and BU Creditors' Committees filed responses indicating conditional support of the Debtors' motion.

On August 13, 1984, just three days before a hearing on this motion was scheduled to commence, Shareholders filed a motion in the United States District Court for the Southern District of Ohio to withdraw the automatic reference of the motion from the Bankruptcy Court. Shareholders asserted that a determination by this Court of Debtors' motion to sell the partnership interest would require consideration of the Bank Holding Company Act of 1956, 12 U.S.C. § 1841 *et seq.*, and accordingly that withdrawal of the reference was mandatory under § 157(d) of the Bankruptcy Amendments and Federal Judgeship Act of 1984.

Shareholders also requested an order to show cause why the hearing on Debtors' motion should not be adjourned, asserting that they had not had adequate time to study the matter and that counsel could not be present for the hearing.

At 8:07 a.m. on August 16, 1984, United States District Judge Walter H. Rice overruled Shareholders' motion to withdraw the reference, finding that consideration of the Bank Holding Act by the District Court or the Bankruptcy Court would be unnecessary and inappropriate, given the Federal Reserve Board's primary and exclusive jurisdiction to determine matters arising under 12 U.S.C. § 1841 *et seq.* The Court further directed this Court to "conduct an evidentiary hearing on the question of whether the present motion was timely ..."

In compliance with the District Court's instruction, this Court addressed the timeliness issue as its first order of business at the August 16 hearing. Counsel for Shareholders and the Debtors stipulated that their representations pertaining to this issue were accurate, thus obviating the need for testimony. The matter was taken under submission, and findings of fact on this issue are set forth below. (See Findings of Fact 4 through 9.)

The Court denied the Shareholders' request for an adjournment, but granted all objecting parties ten days to engage in discovery regarding certain aspects of the proposed sale of the partnership interest, particularly those pertaining to Ameritrust's arrangements with certain debenture and warrant holders, and to introduce additional evidence into the record. The evidentiary hearing on Debtors' motion was thereafter convened, and continued in progress through August 17. Pursuant to Shareholders' August 28 motion, the hearing was reopened on August 30 and continued into that evening.

At the close of the hearing, the Court allowed all parties to submit either proposed findings of fact or briefs by September 19, 1984. The Debtors, Shareholders, Schroder, the FDIC, the Arkansas Commissioner, and the Friends of the Fine Arts Trust all filed either briefs or findings. Due to confusion over page allowances, and pursuant to requests by both, Shareholders and Schroder were granted until October 12 to submit additional findings of fact not to exceed the 35 pages submitted

---

1. The motion does not fit easily within the boundaries of 11 U.S.C. § 363 since Debtors seek permission not to "use, sell or lease" property, but to agree to the dissolution of the partnership. We believe, however, that the standard of § 363 should govern our determinations.

by the Debtors. In addition, at the September 20 status conference held in these cases, the Debtor and Shareholders were directed to enter into discussions regarding possible stipulations, particularly as to the percentage of debentures tendered. By telephone conference on September 25, 1984, Schroder was allowed to participate in those discussions and join in any stipulations. The additional proposed findings were duly filed on October 12, 1984, but no stipulations have yet been filed.[2]

Having reviewed all the evidence and arguments presented, the Court hereby submits its Findings of Fact, Opinion and Conclusions of Law.

## I. FINDINGS OF FACT

### A. HISTORICAL OVERVIEW

1. Beginning in 1967 D.H. Baldwin Company owned all of the stock of the Central Bancorporation, Inc. ("CBI"), a Colorado bank holding company which at the time held twelve banks in Colorado.[3] Because of certain amendments to the Bank Holding Company Act enacted in 1970, and because of its ownership of a savings & loan institution and insurance companies, DHB was required to divest itself of the CBI stock by no later than December 31, 1980. Because of a variety of legal problems and accounting problems, as well as a limited market for sale of all of the stock

outright, DHB management devised an excruciatingly intricate means of divestiture. The centerpiece of the plan is Central Colorado Company, a limited partnership created to acquire 95% to 96% of the CBI stock.[4] CCB, Inc. was organized to act as general partner for the limited partnership, and was given 3.3% of the partnership's equity in exchange for a $3.6 million contribution to the partnership. CCB is owned primarily by bank management.

The partnership has two classes of limited partnership interests. Class 1 partnership units entitle the holder to vote on certain matters and to receive partnership distributions. (Debtors' Ex. 15, Sections 3.2; 8.5) The Class 1 limited partnership interests contributed approximately $4.8 million to the partnership and hold 4.3% of the partnership equity.

The Class 2 partnership interest is held exclusively by DHB, which contributed 95% to 96% of CBI's stock to CCC in exchange for a 92.4% share of the partnership equity. (Debtors' Ex. 15, Section 4.5(c)) A number of structural limitations were built into this class of interests in order to satisfy the Federal Reserve Board's divestiture requirements. The Class 2 interest is entitled to receive partnership distributions, but has no voting rights. As a further means of preventing DHB from exercising any domination of CBI through its substantial economic interest, steps were taken to

2. Rather, on October 12, the deadline for stipulations, the Debtors filed a Memorandum Concerning Additional Stipulations of Fact. (Consolidated Case No. 1–83–02495, Doc. 1222) In that memorandum, the Debtors reported that agreement had been reached on October 10 with a group of former B–2 debenture holders which resulted in a 95.46% tender of all outstanding debentures. (Counsel for the former B–2 holders had announced at the August 30, 1984 hearing that his clients' tender was conditional.) Debtors stated that they were willing to stipulate as to that agreement and the resulting percentage but that stipulations had not yet been agreed upon by the parties due to the late date of the agreement. On October 17, Schroder filed a motion to reopen the hearing to allow introduction of evidence as to the agreements reached between the Bridgeland clients, the Debtors and Ameritrust, in essence, because it has not yet received a full set of the documents underlying

the agreements. (Consolidated Case No. 1–83–02495, Doc. 1228) Schroder argues in its motion that these subsequent events make it apparent that a stipulation between Debtors and Objectors "would be neither appropriate nor sufficient." We disagree for the same reason we denied Schroder's motion of September 14, 1984, to reopen the hearing as to the issue of the conditional tender. Either the debentures are tendered or they are not. Whichever is the case, we view the situation one that can and should be handled by stipulation. We can find no adequate reason in Schroder's motion to again delay, at great expense to all concerned, a decision on this matter. Thus, Schroder's motion of October 17, 1984 is hereby denied.

3. It now holds 19 banks.

4. Some 4% of CBI's stock was set aside for other purposes and is not held by the partnership.

neutralize that interest. Baldwin United Corporation ("BU"), DHB's parent, issued approximately $170 million worth of Senior Term Debentures due in 1996 in three series: A, B–1 and B–2. The amount of interest paid on these debentures was to be based in part on the amount of partnership distributions received by the Debtors' from its Class 2 interest.

As a further step towards total divestiture, DHB issued Series A warrants to accompany BU's Series A Debentures. These warrants can be exercised as early as December 31, 1986, (Debtors' Ex. 14, Section 3.01) and entitle the holder to purchase a pro rata share of the Class 2 interest. (Debtors' Ex. 14, Section 2.01) These shares of the Class 2 interest then automatically convert into Class 1 units (Debtors' Ex. 15, Section 3.4), which in turn may be exchanged for CBI stock. (Debtors' Ex. 15, Section 3.7) Thus the exercise of these Series A warrants could eventually result in the complete divestiture of DHB's Class 2 interest.

CCC also issued Series B–1 and B–2 warrants to B–1 and B–2 debenture holders. These warrants may be exercised as early as December 31, 1985, and entitle the holders to purchase additional Class 1 interests. (Debtors' Ex. 15, Section 4.3) This maze of ownership tentacles is graphically illustrated in Exhibit A–1 attached hereto. The Board of Governors of the Federal Reserve System approved the CCC plan of divestiture on July 30, 1980. (Debtors' Ex. 4)

2. The divestiture plan was launched in early 1981. The appropriate contributions to CCC's partnership property were made, Class 1 partnership units were sold, and debentures with accompanying warrants were issued with the First National Bank of Chicago ("First Chicago") serving as indenture trustee and warrant agent. (Debtors' Exs. 13 and 14) Business transpired to everyone's satisfaction until early spring of 1983, when the Baldwin-United

superstructure began to collapse under its own weight.

By late spring of that year, the financial condition of BU and DHB reached crisis proportions, and the crisis intensified when BU ceased to make interest payments to the Series A, B–1 and B–2 debenture holders. With First Chicago leading the charge, the debenture holders promptly became among the most aggressive and relentless of Baldwin's creditors—no small accomplishment given the nature and size of the besieged company's other creditors.

The debenture holders, as well as certain other bank creditors, were held at bay by means of a series of "standstill" agreements consummated in April and June of 1983. (See, e.g., Debtors' Ex. 7, Ex. 6 attached thereto.) By way of these agreements, certain B–2 debenture holders, who had previously presented their debentures seeking early payment, were given substitute obligations in the form of demand notes.

3. On September 26, 1983, some four days prior to the expiration of the second standstill agreement, four B–1 debenture holders (David Niskanen, Paul M. Niskanen, William A. Niskanen, Jr., and the estate of William A. Niskanen) filed involuntary Chapter 11 petitions against BU and DHB.[5]

Barely a week had passed when the prepetition fight between the Debtors and the debenture holders shifted to this Court. On October 5, First Chicago filed a motion "to restrict debtors' use of cash collateral," alleging that DHB had received a partnership distribution of over $2 million through its CCC Class 2 interest, and that the money rightfully belonged to the debenture holders pursuant to the Federal Reserve Board's divestiture requirements.

A preliminary hearing on this motion was conducted on October 17, 1983, at which time this Court ordered the parties to meet and confer in an attempt to resolve their differences. A final hearing on the

---

**5.** Only minutes later, the Debtors filed voluntary petitions in the U.S. Bankruptcy Court for the Southern District of New York. On September 27, 1984 the debtors consented to the jurisdiction of this Court.

motion was scheduled for November 11, 1983. The parties thereafter complied with the Court's order—with a vengeance. After heated negotiations extending over many days and nights, on November 9, 1983, the parties reached a "stipulation" which, at least in the Court's view, would have set aside a piece of the Debtors' assets for the exclusive benefit of one highly vocal group of unsecured creditors, without any showing of their entitlement to those assets and without resolving the underlying dispute.

In the meantime, on November 11, First Chicago filed an adversary proceeding against the Debtors in which it alleged, among other things, that the dividends received by DHB from its Class 2 interest were not property of the estate, or in the alternative that such dividends were held by DHB in trust for the debenture holders. The complaint further alleged that the Debtors' failure to pay those dividends to the debenture holders violated the Federal Reserve Board's July 30, 1980 Order (Debtors' Ex. 4) approving the plan of divestiture. (*First National Bank of Chicago, et al. v. Baldwin United Corp., et al*, Adv. No. 1–83–0574, Doc. 1)

On November 23, 1983, the Court denied authorization to the Debtors to enter into the stipulation, and set First Chicago's adversary proceeding for trial on January 30, 1984. (*In re Baldwin-United Corp.*, Consolidated Case No. 1–83–02495, Doc. 194) By order of December 16, 1983, this Court extended the trial date to April 2, 1984, and further ordered that First Chicago file an amended complaint joining all claims and parties necessary for a complete resolution of the issue concerning entitlement to partnership proceeds. (Adversary No. 1–83–0574, Doc. 9)

Thereafter, furious discovery and motion practice ensued. All of the debenture holders were joined as parties plaintiff, and numerous other parties were permitted to intervene, including the Official Creditors' Committees for both BU and DHB.

By the end of February, the level of activity in this litigation had reached a fevered pitch. A dizzying array of cross-claims and counterclaims had been filed, with each new claim generating a new round of discovery. The factions were not merely unable to agree with their opponents, but to a large extent were unable to agree among themselves. To further complicate matters, the B–2 debenture holders who had surrendered their debentures in exchange for demand notes filed a separate suit seeking to regain their status as debenture holders. (*Fifth Third Bank, et al. v. The First National Bank of Chicago, et al*, Adv. No. 1–83–0600).

What started out as a relatively straightforward dispute had deteriorated into something resembling the War of the Roses. By early March, 1984, this litigation was consuming much (if not most) of the Debtors' time and resources, with no end in sight. Reorganization efforts would almost certainly be doomed to failure unless these adversary proceedings were resolved, but the time and expense in resolving them would be crippling. Indeed, based upon this Court's review of the fee applications for the professionals appointed to represent the Debtors and the committees, the Debtors were expending at least $100,000 per month on fees and expenses relating to this litigation alone. A conservative estimate of the total expense to the Debtors of pursuing these cases through the final appellate level approaches $5 million. A more reasonable estimate might be $10 million.

Faced with litigation posing a real threat to the Debtors' continued viability and ability to reorganize, on March 2, 1984, this Court imposed a 90-day stay on all adversary proceedings, and ordered that the parties devote all of their energies to settling their differences and developing a plan of reorganization. (Consolidated Case No. 1–83–02495, Doc. 516)

B. THE UNVEILING OF THE AMERITRUST PROPOSAL AND THE TIMELINESS OF THE COMMON STOCKHOLDERS' COMMITTEE'S MOTION TO WITHDRAW THE REFERENCE.

4. Some two to three weeks prior to the scheduled expiration of this Court's stay,

the Court received word that Ameritrust Corporation, an Ohio bank holding company, had made an offer to purchase DHB's Class 2 interest. Counsel for the Debtors confirmed these reports during a status conference held on May 31, 1984. Counsel indicated that the parties were close to reaching an agreement but needed additional time. Pursuant to counsel's request, the Court extended the stay until June 19, 1984, (May 31, 1984 Tr. 6–7) and set a hearing on the matter for June 18.

5. On June 18, counsel for the Debtors reported that an agreement in principle had been reached with Ameritrust, and requested that the stay be extended until June 22 to allow the appropriate documents to be drawn. If the parties were successful in reducing their agreement to writing, then the stay would automatically extend until August 31 so that the transaction could be finalized. Counsel for the BU Creditors' Committee rose in support of Debtors' request, noting that the Committee had voted in favor of the sale on May 24. (June 18, 1984 Tr. 1–8)

Counsel for the Stockholders' Committee was not in attendance at either the May 31 or June 18 hearings, but no one has asserted that they did not have notice of such hearings; nor does their counsel assert that the committee was not fully aware of the Ameritrust proposal prior to these hearings. Indeed, Ameritrust's proposal was a well-publicized fact as early as June 23, 1984. (See press clippings attached as Exhibit B.)

6. The potential disposition of DHB's Class 2 interest was again addressed at the June 28, 1984 status conference, at which time counsel for the Debtors stated that they anticipated that the motion to approve the disposition would be filed in July and "probably set for hearing at the August status conference." (June 28, 1984 Tr. 26)

Counsel for the Shareholders, Mr. Peter Wolfson, was present at this status conference, and obviously was familiar with the Ameritrust proposal, noting that his committee had "real problems" with the proposed disposition. (June 28, 1984 Tr. 39)

7. On July 10, 1984, the President of the United States signed into law the Bankruptcy Amendments and Federal Judgeship Act of 1984. The newly-enacted 28 U.S.C. § 157(d) is found in Title I of the Act, which took effect (with certain exceptions) on the date of enactment.

The Debtors filed their motion for an order authorizing disposition of the CCC partnership interest on July 27, and the matter was duly set to be heard at the August 16 status conference, pursuant to the procedures set forth in Paragraph 8 of this Court's Order Establishing Caption and Notice Procedure entered February 14, 1984. (Consolidated Case No. 1–83–02495, Doc. 435)

8. Approximately one week later, Wolfson sought counsel for the Debtors' agreement to a continuance of the hearing on Debtors' motion. Failing that, a day or two later he sought a continuance from the Court. The reason for the requested adjournment was that he was scheduled to be on vacation August 16 and that Mr. Edgar Booth, another attorney in Mr. Wolfson's office familiar with this case, was scheduled to attend a confirmation hearing in a large Chapter 11 case pending in Texas.

Given the ample amount of notice regarding this matter and its importance to all parties, the Court was unwilling to grant the requested continuance. On August 13 the Shareholders filed their motions to withdraw the reference, as well as a proposed order to show cause why the hearing on Debtors' motion should not be adjourned.[6]

6. The basis for this motion was that the Shareholders had not been given adequate time to study the complexities of the transaction and pursue discovery on the matter. J. Henry Schroder Bank & Trust and the Arkansas Receiver objected on this ground as well. While the Objectors were given an additional ten days to engage in discovery, we wish to reiterate that their position was and is meritless. None of the Objectors even attempted to engage in any discovery prior to the hearing. We further note that J. Henry Schroder Bank & Trust is a member of the BU Creditors' Committee, and had complete access to information about the pro-

■ 9. Based upon the chronology of events stated above, which are largely confirmed by the stipulations of counsel, (August 16, 1984 Tr. 22–42), we have no difficulty in concluding that the Shareholders' motion was untimely as a matter of fact under § 157(d). Counsel for the Shareholders was on notice since at least June 28 that the Debtors intended to file their motion sometime in July, and received notice of the motion shortly after it was filed. If they were sincere in their desire to assert their rights under § 157(d), they could and should have acted immediately upon learning that the motion had been filed. Instead, they waited until three days before the motion was to be heard. Their course of conduct leads us to find that the sole reason for filing the motion was to attempt to secure the continuance which they had failed to obtain from this Court.[7]

## C. THE DETAILS OF THE AMERITRUST PROPOSAL.

10. Reduced to its simplest terms, Ameritrust Company proposes to have A.T. Western Corporation, a newly-created subsidiary, replace DHB as the owner of the CCC Class 2 limited partnership interest. As might be expected, however, a painfully complex disposition scheme is required to unravel this Gordian knot.

The significant highlights of this scheme may be summarized as follows. A new CCC partnership will be formed having the same general partner (CCB, Inc.) and two classes of limited partnership interests as the old CCC. The old CCC will be dissolved. A.T. Western will hold the new Class 2 partnership interest. The old Class 1 partnership unit holders may take cash for their units, or may take units in the new CCC Class 1 interest.

The holders of Baldwin-United Series A, B–1 and B–2 debentures (including the former B–2 debenture holders who now hold demand notes) will surrender their debentures to A.T. Western, and in exchange will receive 20 cents on the dollar for the principal amount of their debentures, plus a "contingent certificate" entitling them to contingent cash payments in the future.

The holders of Series A warrants issued by D.H. Baldwin will surrender their warrants to A.T. Western, and in exchange will

posal as early as May. The Arkansas Receiver stands on no better footing, since it is a non-voting invitee on both the BU and DHB Creditors' Committees. Finally we find it curious that all of the attorneys representing the Objectors made their first appearance in this case *after* the Debtors' motion was filed. None of them was personally familiar with what had transpired in these cases prior to that time. (*See,* August 16, 1984 Tr. 33; August 17, 1984 Tr. 26).

7. While the District Court has not directed us to make conclusions of law on this issue, we note in passing that we are unconvinced by the Shareholders' legal arguments regarding timeliness under § 157(d). Counsel argues that since their motion was filed within the time limits for filing a responsive pleading to the Debtors' motion, it must be deemed timely under the statute. Their argument is based upon The Bankruptcy Court and Federal Judgeship Act of 1983, S. 1013 and the legislative history thereto. Section 1471(e)(1) of that proposed legislation reads in pertinent part as follows:

Any party, or the bankruptcy Judge, may file a petition for recall of any civil *case or proceeding* referred to the bankruptcy court … (emphasis added)

Section 1471(e)(2) then states:

Recall of a *proceeding* pursuant to such petition may be granted in the discretion of the district court, except that recall shall be granted—

\* \* \* \* \* \*

(B) where the district court determines that resolution of the *proceeding* requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce. (emphasis added)

In discussing § 1471(e)(2), the Report of the Senate Judiciary Committee does state that a petition for mandatory recall "must be filed by that party together with its first pleading…" *See,* Senate Report No. 98–55, 98th Cong. 1st Sess. (Bankr.L.Rep. (CCH) No. 94, Part II at p. 17 (April 22, 1983)). However, it is evident that the Committee was referring *only* to mandatory recall petitions in *Marathon*-type adversary proceedings since § 1471(e)(2) refers only to *proceedings,* not contested matters such as motions brought under § 363(b). *See,* Bankruptcy Rules 7001; 9014.

Interestingly, the mandatory withdrawal provisions as finally enacted in § 157(d) also refer only to proceedings, thus raising significant doubts as to whether those provisions have any applicability to contested matters.

receive participation certificates entitling them to a portion of the proceeds from any sale by A.T. Western of its Class 2 partnership interest. The tendered A warrants will be cancelled. The holders of Series B–1 and B–2 warrants which were issued by the old CCC will surrender their warrants to the new CCC, and in exchange will receive a new Series C warrant from the new CCC. These Series C warrants will carry essentially the same rights as the old B warrants.

The old CCC Partnership Agreement (Debtors' Ex. 15), the Trust Indenture (Debtors' Ex. 7, Exhibit 4 attached thereto), and the Warrant Agreement (Debtors' Ex. 14) require approval by at least 75% of the Class 1 Limited Partners, the Series A, B–1 and B–2 debenture holders, and the Series A Warrant holders in order to dissolve the partnership. (*See*, Debtors' Exs. 15 at §§ 8.5, 5.3; 7(4) at § 10.09; and 14 at § 11.03.) The purchase agreement between the Debtors and Ameritrust requires that at least 95% of the debenture holders consent to the sale and surrender their debentures. (Debtors' Ex. 12, section 2(b)(iii)) This requirement, however, may be waived through the mutual consent of the parties. (Debtors' Ex. 12, § 12)

Assuming that a sufficient number of investors approve the transaction, then as to any debentures not surrendered, DHB shall receive 20 cents on the dollar, plus a contingent certificate. Both the money and the certificate will be supplied to DHB by A.T. Western.

The debentures surrendered to A.T. Western will be transferred to the new CCC along with $105 million in cash and sufficient cash and contingent certificates to cover those debentures not surrendered. This package will then be transferred to the old CCC, which will in turn transfer the CBI stock to the new CCC. The old CCC will then be dissolved, and DHB will receive the debentures, cash, and contingent certificates by way of a liquidating distribution.

All of the activity described above, as well as the other details of the disposition as schematically illustrated in attached Exhibit A–2, will occur simultaneously. The result of this metamorphosis will look something like attached Exhibit A–3.

The key to the success of this proposal, (or for that matter, any other proposed disposition of DHB's Class 2 interest) obviously centers on obtaining the approval of the debenture, warrant, and Class 1 unit holders—no mean task given the rancor demonstrated thus far by those parties in this case. To date, A.T. Western has received the consent of over 75% of the Class 1 partners and the apparent tender of some 95.46% of the B–1 and B–2 debentures. The Series A warrants and debentures have all been surrendered. (August 30, 1984 Tr. 242)

Approval from this Court and from the Federal Reserve Board must still be obtained before the transaction may close. If a closing is consummated, the Debtors will receive $105 million in cash, all of the surrendered Series A, B–1 and B–2 debentures, and contingent certificates for non-surrendered debentures. In addition, the Debtors will receive a cancellation of the Series A warrants. The participating debenture holders, warrant holders, and Class 1 partners will give the Debtors signed dismissals with prejudice in the *First Chicago* and *Fifth Third* adversary proceedings, and releases on claims arising from the debentures and Series A warrants. DHB will also be relieved of the obligation to purchase an additional $10 million in new Class 2 interests from CCB, an obligation which is presently in default. (August 17, 1984 Tr. morning session, 20; Debtors' Ex. 12, Section 2(e); Debtors' Ex. 10) Some $17.9 million of the cash will be put into an escrow account as a reserve fund for any tax liability owed by DHB. (Debtors' Ex. 12, Section 14)

The Debtors have filed a motion to substantively consolidate the Baldwin-United and D.H. Baldwin estates (Consolidated Case No. 1–83–02495, Doc. 966). If that motion is granted, then the effect of having the debentures surrendered to DHB would be an outright cancellation of this inter-

company indebtedness. If the motion is denied, then further proceedings will be necessary to allocate the indebtedness and proceeds of the sale between BU and DHB.

### D. THE MERITS OF DEBTORS' MOTION.

The Debtors have advanced a number of business justifications in support of their motion, each of which has been challenged by the Objectors. For the reasons stated below, we find that the Debtors have met their burden of demonstrating that the disposition will aid their reorganization, and is supported by sound business reasons.

#### i. *The Ameritrust Proposal Affords The Debtors Fair Value For Their Class 2 Partnership Interest In CCC.*

11. The bulk of the evidence presented at the hearings on Debtors' motion centered on the potential value of the CBI stock. Debtors presented expert testimony on the question of valuation from Henry C. Barkhorn, vice-president of the Investment Banking Division of Goldman Sachs & Company (GS), as well as testimony from Mr. Bruce Blackwell, a BU vice president, regarding a valuation based on a computer model he prepared for Debtors' management. In conducting its analysis, GS took the following steps: it reviewed public financial data on Central Bancorporation, including annual financial statements from 1979 through present and quarterly financial statements from 1983 and 1984; it met with CBI management and reviewed the quality of management; it gathered information on CBI's largest customers and analyzed its loan portfolio; it reviewed the financial performance of CBI's member banks; and it examined the universe of potential buyers of CBI, noting the regulatory restrictions as to who may acquire Colorado banks. GS also compared CBI to four other bank holding companies in Colorado and reviewed the terms of bank mergers of over $50 million that have occurred since 1979.

At the outset of the valuation process, GS assumed that all CBI stock was available for sale in an arms-length transaction free and clear of liens, claims and encumbrances; that the sale would be a cash transaction; and that there would be no changes in current banking regulations. (Debtors' Ex. 3, p. 3; August 16, 1984 Tr. 102, 111) After employing certain financial ratios, and after discussions among members of GS, the firm concluded that, "the consideration which might be received upon the sale of all outstanding capital stock of Central [Bancorporation] ... is likely to be within a range of $170 million to $200 million." (Debtors' Ex. 3, p. 4) These figures represent 115% to 135% of CBI's $140 million book value. (August 16, 1984 Tr. 126) The firm defines "consideration" as "the amount in cash that a willing buyer would pay to a willing seller with neither being compelled to act." (August 16, 1984 Tr. 101)

Both Barkhorn and the Goldman Sachs opinion letter repeatedly caution that "because ... of the difficulties in evaluating the effects of the limitations on sale contained in the debentures, the Series A warrants, and certain other documents and because of the possible effect of such a sale on the bankruptcy proceedings and related litigation," their valuation of 100% of the stock provides little more than a starting point for determining what the 92.4% Class 2 interest might be worth. Indeed, Barkhorn testified that Goldman Sachs was simply unable to value that interest. (August 16, 1984 Tr. 142) Furthermore, while the indicators employed by Goldman Sachs in valuing the stock are useful measuring tools, a considerable amount of judgment was used in arriving at the $170 to $200 million figure, particularly given the fact that the CBI stock is not publicly traded. (August 16, 1984 Tr. 122, 123) Nevertheless, we find that the GS analysis was detailed, thorough and well-reasoned.

12. Using the Goldman Sachs' figure, Baldwin management (under the direction of Peter A. Martosella, President and Chief Operating Officer) sought to estimate a fair value for the Class 2 interest. Since

CCC owns approximately 96% of the CBI stock, it would be entitled to $163,200,000 to $192,000,000 on the sale of all of the stock. With a 92.4% interest in the CCC partnership, D.H. Baldwin would therefore be entitled to approximately $151,000,000 to $177,000,000 of the proceeds.

While DHB will receive $105 million in cash, and potentially will be relieved of the responsibility for servicing $164.6 million in total debt, management reasoned that only a portion of the debenture debt would ever, in all probability, be paid through a plan of reorganization. For purposes of analyzing this transaction they concluded that a reasonable level of payment to the debenture holders through a plan would be 30 to 50 cents on the dollar. Based on this range, the actual value of being relieved of the debenture obligations would be approximately $49 to $82 million dollars. (August 16, 1984 Tr. 189–196) By this calculation, the total value flowing from Ameritrust would be $154 to $187 million, well within the Goldman Sachs stock valuation as adjusted by the percentage of ownership held through the Class 2 interest.

As is true of Goldman Sachs' valuation of the CBI stock, the Debtors' estimate of real value being received from Ameritrust does *not* include the savings derived from the potential dismissal of the *First Chicago* and *Fifth Third* adversary proceedings in their entirety, and the avoidance of further proceedings with the Federal Reserve Board.

13. Management has also analyzed what the present value of the estimated income from the Class 2 interest might be if the Series A warrants were not exercised until 1995. According to Mr. Blackwell, a reasonable estimate of the dividend distributions from CCC and money received from the exercise of the warrants would be between $73 million and $96 million. (August 17, 1984 Tr. afternoon session, 82–84) However, this income estimate is subject to downward adjustment by reason of CBI's announced intention of not declaring a dividend for the third quarter of 1984, and the uncertainty as to future dividends. (Debt-

ors' Ex. 10; August 16, 1984 Tr. afternoon session 28–30)

Furthermore, the Debtors have convincingly established that the present value of the future income stream is significantly less than what $105 million in cash would earn if invested in 90–day U.S. Treasury bills. (August 16, 1984 Tr. morning session, 187, 188) Viewed another way, the future value interest factor of $105 million drawing 13½% interest for 12 years amounts to $480 million. (August 17, 1984 Tr. 74–75)

The only evidence introduced to rebut Debtors' valuation of the CBI stock and Class 2 interest was that of Mr. Jeffrey Schultz, senior vice-president of the firm of S.S. Seidman & Company, and an associate professor at Monmouth College. Mr. Schultz testified that CBI's stock is worth between $220 and $300 million. (August 30, 1984 Tr. 18) In arriving at this estimate, Mr. Schultz placed primary importance upon CBI's capital adequacy, i.e. the degree to which a company raises capital through the sale of stock as opposed to raising capital by incurring long-term debt. (August 30, 1984 Tr. 29, 76–77) However, Mr. Schultz was unable to state unequivocally why this particular ratio was any more important an indicia than, for example, the price earnings multiple, which is one of the key factors underlying Goldman Sachs' appraisal. (August 30, 1984 Tr. 78)

Mr. Schultz admitted that his estimate was not based upon a review of the specific loan portfolios of each of CBI's 19 banks; that he did not review any bank examiners' reports as to any of those banks; and that he had not had any contact with CBI's management. (August 30, 1984 Tr. 42, 43)

He admitted that 50 additional hours of study would be required to prepare a formal opinion on valuation comparable to Goldman Sachs'. He further admitted that he would not advise a client to pay up to $300 million for CBI's stock absent discussions with CBI management and a review of the loan portfolios of the banks. (August 30, 1984 Tr. 46, 47)

We are unable to credit this armchair analysis (buttressed by an unsubstantiated optimism over the future vitality of the oil and gas industry in Colorado) (August 30, 1984 Tr. 23, 24, 81–83) over the formal opinion of Goldman Sachs. Based upon all of the evidence, we are convinced that the Ameritrust proposal will afford the Debtors fair value for their Class 2 interest.

 ii. *The Difficulty Of Marketing Such A Complex Asset, As Well As The Adequacy Of The Ameritrust Offer, Provide Ample Justification For The Debtors To Proceed With The Sale.*

14. The Objectors assert that the fairness of the consideration offered by Ameritrust has not been tested in the marketplace, and that the sale should not proceed until the Class 2 interest has been brokered and additional bids are received.

The Debtors admit that no extensive effort has been made to market the Class 2 interest, but submit that the intricate ownership structure makes it relatively unmarketable.

The Debtors' management team made this determination shortly after taking the helm in the Spring of 1983. New management's first order of business was to evaluate all of Baldwin's assets and develop a disposition program in order to raise desperately needed cash. Because of its non-voting status, problems with the Federal Reserve Board, and its potential elimination through exercise of the Series A warrants, the Class 2 interest was singled out as an asset whose value could be maximized only if it were sold. However, its disposition was not made a first priority because its complexity was viewed as a limiting factor in attracting potential purchasers. As was noted by Victor H. Palmieri, Chairman and Chief Executive Officer of Baldwin, it was so

> ... difficult to describe the transaction and the constraints on the sale and the rights of the debenture holders ... that by the time they got through with it any prospective buyer was likely to be nodding. It would literally take hours to lay out the fundamental status of the transaction.

(Deposition of Victor Palmieri, p. 10)

The initial effort to market the banks was led by George McKinley, President of CBI. With Palmieri's approval, McKinley commissioned Morgan, Stanley & Company to develop a marketing program. A prospective purchaser was located but nothing further materialized.

At least five other parties expressed interest in purchasing the banks and/or the Class 2 interest. Three of those five never progressed beyond the negotiating phase.[8] Mr. Irving Harris, a debenture holder, was thwarted in his effort to acquire the Class 2 interest due to an inability to obtain the approval of other debenture holders. A fifth suitor, BAII Banking Corporation, made a proposal in July of 1984, but was unable to obtain necessary financing. (August 16, 1984 Tr. 175–178)

Ironically, one of the Debtors' attempts to market this asset centered on J. Henry Schroder Bank & Trust Co., the objector most critical of Debtors' marketing attempts. Management approached this creditor regarding the possibility of forming a European banking group to purchase MGIC Investment Company, the largest asset in the Baldwin structure. Management's suggestion that a similar group might be formed to purchase the Class 2

---

8. They included: Mr. George Strike, a debenture and warrant holder; Mr. Mizell, a Colorado entrepreneur, and Mr. Jack Heisler, a debenture holder. (Deposition of Victor Palmieri, pp. 4–13; 27). On September 21, 1984, the Court received a letter from a Mr. Theodore Zeller, a Series A debenture and warrant holder, in which he informed the Court that Bank One (presumably of Ohio) was willing to put forth an offer for the partnership interest. Mr. Zeller was instructed to contact the Debtors and was given names and telephone numbers of Debtors' counsel and management. On October 5, 1984, Mr. Zeller phoned the Court's law clerk and stated again that Bank One had an offer. No further information has come to the Court's attention regarding this purported offer, and the Court has been given no reason to believe that Mr. Zeller is authorized to speak for Bank One, if it does, in fact, have a proposal.

interest apparently generated no interest from J. Henry Schroder Bank & Trust Company. (Deposition of Victor Palmieri, pp. 14, 15)

Contrary to the Objectors' position, the Court does not find it troubling that a major debenture holder such as Ameritrust would ultimately step forward with a firm commitment to purchase the Class 2 interest. The Objectors have stressed the substantial benefits which might flow to Ameritrust from the acquisition. Not only will it literally have bought its way out of these cases, it will also have acquired an asset which *might* ultimately lead to the ownership of CBI.

What Objectors have failed to note are the substantial risks Ameritrust has assumed in the undertaking. Notwithstanding the Objectors' predictions, restrictions on interstate banking may not ease; the Federal Reserve Board may not, for a plethora of reasons, allow Ameritrust ultimately to assume ownership of the banks; and CBI may not prosper in the future. Nor have the Objectors acknowledged the up-front costs and risks assumed by Ameritrust, including the in-house cost of pursuing the transaction, the substantial legal fees expended in developing the proposal and wading through the approval process, and the ultimate risk that sufficient numbers of debenture holders, warrant holders, and Class 1 partners might not consent.

Given the complexity of the undertaking, the substantial risks and the uncertain benefits, we join Palmieri and Martosella in concluding that the possibilities of attracting an outsider to tackle this financial tempest were and are remote.[9] Accordingly, we find that further efforts to market this asset are neither necessary nor warranted.[10]

9. Furthermore, given the adequacy of the consideration being offered, we do not believe that Ameritrust's status as a *debenture holder* raises any cause for concern.

10. As an aside, it should be noted that the Debtors' interest in selling this asset was hardly kept a secret. Many of the largest financial institutions in the United States are creditors in this

### iii. *The Proposed Settlement Of The First Chicago And Fifth Third Litigation Meets The Standards Of Bankruptcy Rule 9019.*

15. As is evident from the history outlined above, the *First Chicago* and *Fifth Third* proceedings have been a major source of disruption and conflict since the inception of these cases. Not only have they drained the Debtors' limited cash income, they have distracted management and counsel from the critical business at hand—reorganization of these estates.

It was this Court's view in March of 1984, and it remains this Court's view, that the continuation of these disputes (particularly the *First Chicago* proceeding) would be detrimental to these estates, if not disastrous. With so many parties involved in the *First Chicago* litigation, and with so many conflicting claims, the trial would test the limits of the adversary process. This Court is not so naive as to believe that any decision it rendered would resolve the matter. A lengthy and expensive trip through the appellate courts seems inevitable.

Regardless of the outcome, the estates would lose. If the Debtors were unsuccessful on the merits in the *First Chicago* proceeding, they would lose all rights to dividends from the Class 2 partnership interest, thus rendering the asset of questionable (if not zero) value. If they were to prevail, their victory would be a Pyrrhic one at best. They would have expended much, if not most, of the Class 2 dividends they might receive in the next few years in defending their right to retain such dividends, and would still have the debenture holders to reckon with as creditors of the estates. This no-win scenario leads us to conclude that the Ameritrust proposal pro-

case, and a number of them sit on the BU and DHB creditors' committees. Furthermore, Ameritrust's proposal was the subject of much print in financial periodicals, as is evidenced by attached Exhibit B. The fact that no firm offers were submitted by anyone else casts further doubts on Objectors' assumptions as to the value and marketability of this asset.

vides the only rational vehicle for achieving a favorable result in these proceedings.[11]

The Objectors correctly observe that to date, not all of the debenture holders have consented to Ameritrust's offer, and that the *First Chicago* and *Fifth Third* litigation will not be completely resolved unless 100% of the debentures are surrendered.

Based upon the representations of counsel as to the status of negotiations with the holdouts, there is reason to believe that 100% approval may eventually be obtained. Even if only 95% of the debenture holders tendered releases to the Debtors, the scope of the *First Chicago* litigation and the attendant risks to the Debtors will be dramatically reduced, particularly since the vanguard of the litigation, First National Bank of Chicago, has already tendered its approval.

Because of the uncertainty of the outcome, the magnitude of the costs, delays, and risks to the Debtors in proceeding with this litigation as it is presently structured and the enormous waste of the Debtors' assets resulting therefrom, we are convinced that it is in the best interest of the Debtors and their creditors to authorize a settlement with consenting debenture holders in both the *First Chicago* and *Fifth Third* proceedings.

iv. *The Debtors Will Receive Additional Value From The Ameritrust Proposal By Avoiding Further Friction With The Federal Reserve Board.*

16. As noted above, the dispute underlying the *First Chicago* litigation began in the Spring of 1983, when DHB refused to pass on the Class 2 dividends it received to BU's debenture holders. The debenture holders have consistently and vehemently argued that DHB's refusal to do so violates the Federal Reserve Board's July 30, 1980 Order approving the CCC divestiture scheme. The Debtors have argued that its obligation to the debenture holders was merely to pay them interest, not pass through the dividends. The Debtors have also taken the position that the debenture holders are entitled to no better treatment than any other unsecured creditor of the estates.

In early September of 1983 at least one debenture holder raised this issue with the Federal Reserve System. (Debtors' Ex. 6) On October 19, 1983, the General Counsel to the Board of Governors of the Federal Reserve System sent a letter to Victor Palmieri which rather clearly sided with debenture holders' position. (Debtors' Ex. 5) In a lengthy response dated November 10, 1983, the Debtors asserted that the July 30, 1983 Order does not require them to pass through the dividends, and that even if it does, the Federal Reserve Board is stayed under 11 U.S.C. § 362 from bringing an enforcement action against the estates. (Debtors' Ex. 7)

The dialogue between the General Counsel and the Debtors continued into the Spring of 1984, when the Debtors responded to an inquiry regarding the precedence of the Bank Holding Company Act over the Bankruptcy Code. (Debtors' Ex. 8)

Putting aside the merits of this debate, it takes little imagination to visualize the significant legal proceedings which may arise from it. The Debtors assert that if the Class 2 interest is not sold, the Federal Reserve Board might ultimately attempt to "defease" DHB of this asset. The Objectors do not dispute this assertion, but glibly respond that the Debtors might prevail in their legal arguments, and that even if they don't, the Federal Reserve Board has

---

11. We note in passing that the Ameritrust proposal may also resolve two lawsuits currently pending in the District Court: one, *The First National Bank of Chicago vs. Baldwin-United, et al,* C–1–83–0635, is a declaratory judgment action seeking a decision as to whether Baldwin-United is in default under § 5.03 of The Trust Indenture dated February 19, 1981, as amended;

the other, *The City and County Bank of Knox County vs. Baldwin-United, et al,* C–1–83–1114, is an action brought by three Tennessee banks, each of which were holders of B–2 debentures (the FDIC has subsequently taken control of two of the banks and now stands in their shoes), which alleges default and seeks prepayment of the debentures.

shown no inclination to press this issue immediately.

We cannot subscribe to the Objectors' easygoing view of the Debtors' involvement with the Federal Reserve Board. Not unlike the *First Chicago* litigation, the Debtors have little to win and a great deal to lose in going head-to-head with the FRB on this issue. The last thing the Debtors and their creditors need is to fight another protracted and costly battle on one, or perhaps two, additional fronts over their right to retain this asset.

We find that the value of the Ameritrust proposal is significantly enhanced by eliminating the possibility that such a battle might be waged.

v. *None Of The Separate Agreements Between Ameritrust And Certain Investors Detract From The Fairness Of The Proposal.*

17. As a part of their objection to the Ameritrust proposal, the Shareholders questioned the propriety of separate transactions between certain investors, banking institutions and Ameritrust. After reviewing the documents, the Court agreed that additional information was needed to determine whether these transactions had the effect of depriving the Debtors of assets which rightfully belonged to them.[12]

After reviewing the testimony and documents presented at the August 30, 1984 hearing, we conclude that the unique position of each of these investors required unique treatment by Ameritrust in order to consummate its proposal. Furthermore, we find that the Debtors suffered no diminution in the consideration they are entitled to receive as a result of these transactions.

We will address each of these special situations seriatim.

18. At some point in time Baldwin sought to sell ten Series A warrants to one of its affiliates, The Farmers' Educational and Co-operative Union of America. Because of a ruling by the Federal Reserve Board that this Baldwin-related entity could not own the warrants, the following transaction was devised: for consideration received of $1.00 per warrant, the ten warrants were given to Mr. George L. Strike[13] to hold. Under specified conditions and pursuant to a purchase agreement among Farmers, BU and Strike, Strike was entitled to purchase the warrants for $5 million plus an additional $3 million for each year that passed after December 31, 1982. In the alternative, he could opt to turn them over to a trustee selected by Baldwin with instructions to sell them for their fair market value. As of June, 1984, Strike still held these warrants.

As part of the Ameritrust proposal, the Debtors will assign their rights in the warrants to Ameritrust (Debtors' Ex. 12, Section 5), and Strike will release his interests in the warrants. Strike will receive no consideration for this release.

While the agreement which Baldwin and Strike originally entered into has puzzling aspects, the Court views the present transaction as a mere housekeeping matter. The ultimate result is the cancellation of these ten Series A warrants along with the other 65 Series A warrants.

19. On August 7, 1981, Chemical New York Corporation (Chemical) entered into an agreement with the George L. Strike Trust, whereby Chemical loaned the Strike Trust approximately $24.5 million to purchase 26 Series A Debentures, 26 Series A

---

**12.** The Objectors claim that the disclosure of these transactions was inadequate and that such inadequacy alone may be cause to deny Debtors' application. We believe that the intensive discovery that followed the initial hearings and the information adduced therefrom cured any defect there may have been in the disclosure. We would note, however, that after careful review of the voluminous documents presented by and apparently available to all the parties prior to discovery, we are not convinced that the original disclosure could be characterized as inadequate.

**13.** Strike's name has appeared in a number of contexts in these cases. At this juncture, it is sufficient to note that he and Morley Thompson, former President of Baldwin, are co-owners of Cincinnati-based American Laundry Machine, Inc. It appears that Strike and Thompson are long-time business associates.

warrants, and 1,064,299 Class 1 limited partnership units from BU. All 26 of the debentures and 3 of the warrants were then sold to Chemical at face value as part of the agreement. Chemical was entitled to receive interest paid on the debentures in an amount equal to the prime interest rate. Any amount of interest paid which exceeded prime would go to the Trust. If the interest paid was less than prime, the Trust was required to make up the difference to Chemical. (Shareholders' Ex. 2)

Under the agreement, Chemical could require the Trust to repurchase the debentures pursuant to a specified timetable, and the Trust had rights to repurchase the debentures at its option. (*Id.* section 5). As of June, 1984, none of the debentures had been repurchased by the Trust.

In addition, the Trust agreed not to encumber the Class 1 partnership units and 23 warrants which it continued to hold. (Shareholders' Ex. 2, Sections 9(b), 6(E)) As additional collateral, George Strike pledged to Chemical his 50% equity ownership in TF Corporation. (Stockholders' Ex. 5; August 30, 1984 Tr. 152, 153) TF in turn holds all of the stock of American Laundry Machine, Inc. (See footnote 13 *supra.*) (August 30, 1984 Tr. 126) This pledged stock has been valued at $2.5 million. (August 30, 1984 Tr. 153)

20. In a similar transaction, on March 5, 1981, Chemical loaned The Trust of the Friends of the Fine Arts in Cincinnati ("Fine Arts Trust") $19,442,220 to purchase 20 Series A debentures and warrants and 533,340 Class 1 limited partnership units. This loan was to be repaid in 7 consecutive yearly installments with a balloon payment in 1989. (Shareholders' Ex. 6)

The Fine Arts Trust was to sell, according to a certain timetable, the Class 1 units, debentures and warrants to certain qualified individuals who served as grantors of the Trust. (Shareholders' Ex. 6, Schedule I) The Fine Arts Trust was entitled to all of the interest on the debentures, and distributions on the partnership interests "attributable to the calendar year ending on or about the Date of Purchase thereof."

(Shareholders' Ex. 7, Section 1(e)) Pursuant to requirements imposed by Chemical, certain of the prospective purchasers were required to have stand-by purchasers in the event of default on the purchase obligations. (August 30, 1984 Tr. 142, 143; Shareholders' Ex. 8)

As security for the loan, the Fine Arts Trust assigned and pledged to Chemical all of the debentures, warrants, Class 1 units, purchase agreements, and stand-by purchase agreements, giving Chemical the right to enforce such agreements. (August 30, 1984 Tr. 145; Shareholders' Exs. 9 and 10)

As of August 30, 1984, some of the purchasers had fulfilled their obligations under the purchase agreements while others had not. Chemical made a demand upon one of the grantors in default and is pursuing legal action to enforce the purchase agreement. (August 30, 1984, Tr. 146, 147)

21. By agreement dated June 15, 1984, Ameritrust has agreed to pay Chemical $26,691,881 for the 26 debentures, 3 warrants, debenture purchase agreement, pledge agreement and TF Corporation stock which it holds as security for the Strike Trust loan; and the term loan agreement, term note, and all collateral which Chemical holds as security for the Fine Arts Trust loan. In essence, Ameritrust will simply step into the shoes of Chemical. (Shareholders' Ex. 11) The consideration Chemical receives will amount to 65 cents on each dollar owed to it. (August 30, 1984 Tr. 150) It will, however, give up all rights to receive future earnings from the contingent certificates to be issued by Ameritrust in place of Baldwin's debentures.

22. A separate agreement was entered into between the George L. Strike Trust, George L. Strike and Ameritrust on June 26, 1984. Under that agreement, Ameritrust will acquire additional warrants and Class 1 interests owned by Strike individually, the George L. Strike Trust and the LNS Trust. The Strike Trust will surrender its 23 Series A warrants and 1,064,614 Class 1 units; Strike individually will surrender 25 Class 1 partnership units; and

the LNS Trust will surrender its 25 Class 1 units. In exchange, Strike and the Strike Trust shall jointly receive $2.5 million, the TF Corporation stock shall be returned to Strike, and Strike and the Strike Trust shall receive releases on their obligations to Chemical which were assigned to Ameritrust. (Stockholders' Ex. 14)

23. On August 9, 1984, the Fine Arts Trust and Ameritrust entered into an agreement whereby the Trust and grantors would assign and cause to be delivered to Ameritrust the debentures, warrants and Class 1 units. In exchange, Ameritrust will transfer to the appropriate parties 20 cents on the dollar and certificates of participation called for in the warrant and debenture offers, and will transfer cash for the Class 1 units. In addition, Ameritrust will transfer to the Trust and grantors the notes and pledge agreements which Chemical assigned to Ameritrust. (Shareholders' Ex. 19)

24. On March 5, 1981, the First National Bank of Chicago loaned the Camargo Trust some $3,305,554 to purchase Series A debentures and warrants and 93,334 Class 1 units. Without further belaboring the point, this arrangement was nearly identical to the one entered into between the Fine Arts Trust and Chemical. (August 30, 1984 Tr. 197)

25. On July 6, 1984, Ameritrust and First Chicago agreed in principle that Ameritrust would purchase the Camargo Trust notes and collateral held by First Chicago for $2,209,278 on an outstanding balance of $3,398,889, or 65 cents on the dollar. (Stockholder Ex. 16)

26. On August 9, 1984, Ameritrust and Camargo Trust entered into an agreement containing the same material terms as Ameritrust's agreement with the Fine Arts Trust. (Shareholders' Ex. 18)

27. There are three salient points which clearly emerge from a review of these transactions. First, from the inception of the CCC divestiture scheme, these trusts, to some extent, have always been treated as a category of investors separate and apart from other investors. (e.g., Debtors' Ex. 15, pp. 7, 8)

Second, these entities collectively hold an interest in the majority of the 75 Series A warrants outstanding, and a significant portion of the Class 1 units. Because these warrants carry the right to buy out DHB's Class 2 interest, and because approval of at least 75% of the Class 1 units and Series A warrants are required to dissolve the partnership, it is of critical importance that Ameritrust obtain their consent. (August 30, 1984 Tr. 242)

Finally, and most importantly, the agreements between the banks, trusts, and individuals involved deprive the Debtors of nothing, since Debtors received all of the consideration due them when the debentures and warrants were originally sold.

The Objectors do not seriously argue with any of these points. They assert instead that these agreements unfairly discriminate among the debenture and warrant holders, since they provide more consideration to the parties involved than any of the other investors will receive.

We cannot agree. Initially, we find it curious that they would raise this argument, since with the exception of the FDIC, none of them represent the interests of the CCC investors.[14] Furthermore, the FDIC has not objected to the Ameritrust proposal on this ground.

14. As part of her response to Debtors' motion, the Arkansas Insurance Commissioner claimed the entire proceeds of the sale of the Class 2 interest by virtue of the ownership by National Investors Pension Insurance Company ("NIPIC"), a Baldwin subsidiary in rehabilitation proceedings in Arkansas, of 2000 Class E–1 cumulative preferred shares. The Commissioner argues that since the E–1 holders are not dealt with in the Ameritrust proposal, the transaction discriminates against them in favor of more "vocal" creditors. Despite being vigorously represented by counsel throughout the hearings on this matter, no evidence was submitted to verify the Commissioner's claim, nor was this issue ever the subject of testimony. We thus have no basis on which to determine the merits of this argument, but must conclude that on the record before us the contention appears groundless.

Second, there is no clear evidence in this record that Strike, the Strike Trust, the Fine Arts Trust, or Camargo Trust are receiving more consideration for their interests than other investors. Even if they are, we do not find that the discrimination is unfair, particularly given the size and importance of the block of interests involved, as well as the unique circumstances of their holdings.

Finally, we credit the testimony of Mr. William Haffke, senior vice-president of Ameritrust, who stated that every attempt was made to establish parity among the investors. If certain investors believe that they are being treated unfairly, their remedy lies in refusing to tender their consent to Ameritrust's proposal.

Based on the above, we conclude that these special agreements are not detrimental to the Debtors or any group of creditors.

## OPINION

The common theme running throughout the Objectors' opposition to Debtors' motion is that an asset of this magnitude may not be sold except through a plan of reorganization. Relying primarily upon the holdings in *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) and *In re White Motor Credit Corp.*, 14 B.R. 584 (Bkrtcy. N.D.Ohio 1981), the Objectors urge that a showing of extraordinary circumstances by the Debtors is a prerequisite to approving such a disposition under § 363(b), and that the Debtors here have failed to meet this burden.

While the Objectors' arguments may have carried weight prior to the passage of the Bankruptcy Code of 1978, neither the Code nor the U.S. Courts of Appeals that have spoken on this issue support Objectors' view.

While we recognize the tension which exists between § 363, which requires only court approval to sell an asset, and the disclosure and voting rights found in Chapter 11, we find nothing and have been directed to nothing in the Code which so limits the Debtors' right to seek approval for the disposition of a major asset. We believe that the appropriate balance between the creditors' rights under Chapter 11 and the debtors' rights under § 363 was struck in *In re Lionel Corporation*, 722 F.2d 1063 (2nd Cir.1983).

There, the Court was asked to approve the debtor's application to sell its most important asset, an 82% interest in an electronics manufacturing firm, constituting 34% of debtor's assets. The Second Circuit overturned the Bankruptcy and District Court approval of the sale. In doing so it rejected both the Equity Committee's argument that major sales outside a plan require an emergency, and the Creditors' Committee's belief that the bankruptcy judge has nearly unfettered discretion to approve such sales. The standard devised by the Court "gives the bankruptcy judge considerable discretion yet requires him to articulate sound business justification." 722 F.2d at 1066. Noting that the debtor has the initial burden of establishing that it has met this standard, the Court then outlined, for illustrative purposes only, a list of factors which a Bankruptcy Judge should look to in determining whether the disposition is grounded on sound business reasons:

He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

722 F.2d at 1071.

As our findings of fact indicate, we believe that the Debtors have met these criteria. While the partnership interest consti-

tutes approximately 40% of the Debtors' assets, it was and would continue to be a millstone for the Debtors and creditors to bear. Its structure makes it totally unmalleable as a workable asset in the short term, and potentially nonexistent as an asset in the long term. It could serve only as a centerpiece for continued litigation, not a plan of reorganization. Taken as a whole, the testimony presented bears out Debtors' contention that the fair value of the partnership interest can only be realized by selling it, and that the Ameritrust proposal provides the best opportunity presently available for realizing that fair value.

Unlike the *Lionel* case, where the debtor filed a plan only four days after the sale of their manufacturing facility, these Debtors have many hurdles to cross before a plan of reorganization can be proposed, let alone confirmed. Those hurdles may prove to be insuperable if this disposition is not consummated.

Finally, because of the cost of defending their entitlement to hold this asset and retain the income from it, the capital contribution required of the Debtors under the partnership, and the uncertain prospects for future dividends from CBI and corresponding partnership distributions to D.H. Baldwin, this partnership interest is highly susceptible to becoming a wasting asset, if it is not one already.

The Objectors have responded to Debtors' prima facie case by asking the Court to ignore the significant risks to Debtors' continued ownership of this asset, and to imagine the best of all possible worlds. They invite us to imagine that the legal restrictions on bank acquisitions by out-of-state banks do not exist; the Federal Reserve Board's order of divestiture does not exist; the Series A warrants can be rejected as executory contracts, thus clearing the way for DHB to take control of CBI; DHB is not in default on its subscription agreement with CBI; and an appropriate Colorado or foreign investor is available to buy the Class 2 interest at a price greater than that offered by Ameritrust.

In essence, Objectors invite us to ignore reality in favor of a purely theoretical construct having no basis in fact, an invitation which we must decline.

Contrary to their assertions, neither *Lionel* nor any other authority requires the Debtors to wait for the very best offer at the risk of serious harm or outright destruction. They are simply required to justify the proposed disposition with sound business reasons, a burden they have met and the Objectors have failed to rebut.

Notwithstanding Objectors' contentions, our approval of this disposition and the compromises flowing therefrom are consistent not only with the *Lionel* guidelines, but with the *Braniff* holding as well. In *Braniff*, the Fifth Circuit Court of Appeals overturned Bankruptcy and District Court approval of transactions between the debtor Braniff Airways, its creditors, and Pacific Southwest Airlines. The transactions would have transferred cash, airplanes, equipment, terminal leases and landing slots from Braniff to PSA in returned for unsecured notes, profit participation and travel scrip. The rights of Braniff's creditors would also have been substantially altered. 700 F.2d at 939. The Court found this transaction to be outside the scope of § 363(b) and ruled that the Bankruptcy Court and the debtor "should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan *sub rosa* in connection with a sale of assets." *Id.* at 940.

Unlike the *Braniff* situation, the transaction in question will not effectively liquidate the debtor. The disposition of the partnership asset will not leave the Debtors unable to survive as an ongoing concern. To the contrary, the removal of this asset and its attendant problems should have the effect of clearing away substantial obstacles to reorganization. Unlike *Braniff*, the Debtors here are not dictating the terms of a plan by way of this disposition, nor does the disposition elevate the interests of one group of creditors over other creditors. Ameritrust, not the estates, is offering the

partnership investors what it believes to be fair value for their interests, an offer which they are free to accept or reject. If the offer is accepted, Debtors will be relieved of a substantial portion of their debt, to the benefit of their other creditors. At the same time, Ameritrust is offering the Debtors fair value in cash for the Debtors' interest in the partnership, which will be subject to distribution by way of a plan of reorganization. So far as we can ascertain, nothing in this transaction violates the holding of *Braniff,* since nothing mandates any particular vote by any particular creditor or group of creditors if and when a plan of reorganization is presented. In sum, we have no quarrel with the decision in *Braniff*—we merely find it clearly distinguishable on the facts presented.

The sole remaining issue concerns the approval of the proposed compromise and settlement of the *First Chicago* and *Fifth Third* adversary proceedings pursuant to Bankruptcy Rule 9019(a). We outlined the governing standards for determining this issue in a previous order in this case (*In Re Baldwin-United Corp.* Consolidated Case No. 1–83–02495, Doc. 194). They include the following:

1. The likelihood that the Debtor will succeed on the merits, and the measure of benefit to the estate in the event that the Debtor does succeed;

2. The amount of cost and delay in bringing the litigation to a conclusion;

3. Whether the disallowance of the settlement would result in a waste of the estate's assets; and

4. Whether upon a consideration of all of the facts, the settlement is in the best interests of creditors.

As noted above (see footnote 2), issues involved in the *Fifth Third* litigation have been mooted by the agreement which apparently has been reached between the former B–2 debenture holders who hold demand notes and Ameritrust. That same agreement will also result in the disposition of the claims of 95% of the debenture hold-

ers in the *First Chicago* litigation, thus making the resolution of the remaining 5% of the claims far less complicated and expensive.

The beneficial effects flowing from the *Fifth Third* settlement and the significant contraction of the *First Chicago* proceeding can hardly be overstated. The enormous financial burden of litigating these no-win disputes will be substantially relieved, as will the distraction and drain of human resources attendant with these suits. Indeed, we believe that these compromises constitute one of the most positive steps toward the Debtors' reorganization which has thus far occurred in these cases.

Based upon all of the above, the Debtors' motion for an order authorizing the disposition of partnership assets and approving the proposed compromise of certain claims is hereby GRANTED.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 as enacted on July 10, 1984.

2. The Debtors are hereby authorized to dispose of their Class 2 limited partnership interest in the Central Colorado Company pursuant to 11 U.S.C. § 363(b). The Debtors have demonstrated sound business reasons for this disposition, and have carried their burden of demonstrating that the disposition will aid in their reorganization (*In re Lionel Corp.,* 722 F.2d 1063, 1071 (2nd Cir.1983)), as noted in some detail above.

3. Adequate notice of this transaction was given to all interested parties pursuant to Bankruptcy Rule 2002 and this Court's Order Establishing Caption and Notice Procedure of February 14, 1984. (Consolidated Case No. 1–83–02495, Doc. 435)

4. Pursuant to Bankruptcy Rule 9019, the Court approves the compromise of claims resulting from the dismissal of the adversary proceedings captioned *The First*

*National Bank of Chicago, et al vs. Baldwin-United Corp., et al,* and *The Fifth Third Bank, et al vs. The First National* *Bank of Chicago,* currently pending in this Court.

IT IS SO ORDERED.

EXHIBIT A-1

CENTRAL COLORADO COMPANY

EXISTING PARTNERSHIP

EXHIBIT A-2

FLOW OF CONSIDERATION IN PROPOSED TRANSACTION

EXHIBIT A-3

NEW CENTRAL COLORADO COMPANY

PROPOSED PARTNERSHIP[1]

[1]Assuming all Warrants and Debentures are exchanged.

EXHIBIT B
Page One

Saturday, June 23, 1984  THE CINCINNATI ENQUIRER

# Ameritrust, Baldwin Reach Deal On Purchase Of Colorado Banks

**BY GREGG FIELDS**
Enquirer Reporter

Ameritrust Corp., one of Ohio's largest bank holding companies, has agreed to purchase Baldwin-United Corp.'s indirect interest in a group of Colorado banks for $105 million.

Although Baldwin, which is operating under Chapter 11 of federal bankrupcy laws, and its creditors expressed support for the plan, all sides stressed that the pact isn't final.

The plan must be approved by the holders of $154 million in Baldwin debentures. The plan must also be approved by the Federal Reserve Bank and U.S. Bankruptcy Judge Randall Newsome, who is overseeing Baldwin's corporate reorganization.

"Everyone has agreed, but there are still a lot of approvals needed," said Hall Webb, an executive with Chemical Bank of New York, one of Baldwin's largest creditors. "However, to my knowledge almost all the debenture holders approved of the transaction, including us."

The debentures in question were sold by Baldwin in 1980 when the Federal Reserve Bank forced Baldwin to divest itself of its Colorado banking operations. The debentures enabled Baldwin to maintain a 95% interest in Central Bancorp. of Colorado, although Baldwin wasn't allowed to exert any management influence or control over the banks.

THE DEBENTURES paid interest. There were also warrants attached to the debentures which allowed the debenture holders to purchase shares in the Colorado banks at some point in the future.

That deal is now off. Under the terms of the deal announced Friday, Ameritrust will pay debenture holders $30.9 million in cash when debentures are turned in.

Also, for the next eight years the debenture holders will receive annual payments equal to approximately 26.4% of the banks' net income.

The warrants are also no longer valid. "The warrants will be exchanged for certificates of interest that would allow the debenture holders to share in proceeds should the banks be resold," said Monica Martines, a spokesman for Ameritrust. "(The warrant holders) would be unable to buy the bank." (Ameritrust itself holds about $22 million worth of the debentures. A debenture is a debt instrument backed by a corporate promise to repay.)

Baldwin officials were excited about the proposal. Baldwin owes its creditors more than $1 billion and has been selling off assets to raise capital.

"IT GREATLY simplifies our reorganization efforts," said Baldwin President Peter Martosella Jr. "And it is consistent with our plan for the staged disposition of certain operations and assets."

He said Baldwin will go to the bankruptcy court with the proposal in July. "If that goes through, we'll look forward to closing it in August." He added: "We celebrate when the money comes in."

Debenture holders, however, acknowledged that they may never get their entire investment back. The $30.9 million payment from Ameritrust is only about 20% of the principal amount of the debentures.

Also, the Colorado banks made $15.7 million last year. That would have allowed $4.14 million for distribution to debenture holders. Multiplied by eight, the plan would yield debenture holders a total of only $64.05 million on the $154 million in debentures.

"How debenture holders will come out is subject to the performance of the banks over the next eight years," said Irving Harris, who is trustee for three investment groups that invested more than $30 million in Baldwin debentures. "Based on projections, it looks like there is a good chance for a reasonable recovery."

HE SAID he favors the plan and expects the members of the investment trusts will support it as well. "It avoids an enormous amount of arguing over assets," he said. Not arguing, he said, which will save legal fees for the parties involved.

He added that other parties offered different plans for buying the Colorado banks, "but the other plans, although some offered more, also carried more risks."

Joseph Head, a Cincinnati attorney and Baldwin debenture holder, said he wasn't yet sure of whether he'll support Ameritrust's proposal. "We were kept informed of things, but didn't have much of a role in negotiations," he said. "We'll just have to look at it when it's laid out fully."

It wasn't clear Friday how the Ameritrust proposal will affect Chemical Bank. Chemical holds more than $25 million in Baldwin debentures. It purchased most of them from George L. Strike, a business partner of former Baldwin President Morley P. Thompson.

THERE IS a repurchase agreement whereby Strike is obligated to buy back the debentures, but Webb declined to say how that agreement would change if the debentures are turned in.

"That's pretty much a confidential matter between us and our client," Webb said.

Strike couldn't be reached for comment. His attorney, Gregory Meurer, declined to comment.

Meanwhile, Baldwin will continue to sell off assets, said Martosella, the company president. "The major thrust right now is an evaluation of MGIC Investment Corp.," he said.

Baldwin purchased MGIC in 1981 for $1.2 billion, and much of its debt is traceable to borrowing to finance that purchase. "There is a management proposal for a buyout," he said. However, he said that proposal "is in the early stages."

# 912

THE WALL STREET JOURNAL
Monday, June 25, 1984

## AmeriTrust Says It Will Buy 92% Of Partnership

### Baldwin-United Unit to Sell Interest in Group Owning Denver's Central Bancorp.

By DAMON DARLIN
*Staff Reporter of THE WALL STREET JOURNAL*

AmeriTrust Corp. said it has agreements from Baldwin-United Corp. and Baldwin creditors to buy a 92% equity interest in a partnership that owns Central Bancorp. of Denver.

AmeriTrust, a Cleveland-based bank holding company, will pay $105 million to Baldwin's D.H. Baldwin Co. unit, which holds the equity interest. AmeriTrust also will pay $30.9 million to holders of $154 million in Baldwin debentures and warrants, and, for the next eight years, will make annual payments of about 26.4% of the net income of Central Bancorp. AmeriTrust owns another $22.6 million of those debentures.

AmeriTrust has been looking for a major bank acquisition. The company has said it could avoid being a takeover target of out-of-state banks—should interstate banking be approved—if it were large enough.

Moreover, the sale greatly simplifies Baldwin's complex reorganization efforts by removing the contentious debenture holders from the list of Baldwin creditors. "It is consistent with our plan for the stage disposition of certain operations and assets," said Peter A. Martosella Jr., Baldwin president.

#### Approval Expected

The sale must be approved by the Federal Reserve Board and the federal bankruptcy court in Cincinnati supervising Baldwin's complicated Chapter 11 filing, which protects it from creditors as it reorganizes. AmeriTrust has said that because it is buying non-voting equity it expects the Fed to approve the transaction. Baldwin said it expects the sale to close in August.

Central Bancorp., one of Colorado's five largest bank holding companies, has 19 banks on both sides of the Rocky Mountains and is building four new banks. It had net income of $15.7 million, or $1.39 a share, in 1983. The holding company's year-end 1983 book value was about $145 million. Baldwin's quarterly dividend from Central Bancorp. has been about $1.7 million.

Rival Colorado bankers said Central Bancorp. is a "strong competitor." But, as a Colorado banking official described it, Central Bancorp. is also "a strange bird." AmeriTrust won't be allowed to talk to the bank officers and vice versa. In addition, because of the unusual hierarchy of partnerships that own the banks, the Central Bancorp. managers essentially report to themselves in the guise of directors and holding company owners.

Baldwin acquired Central Bancorp.'s predecessor, Central Bank of Denver, in 1969. Baldwin provided some of the money for the one-bank holding company to add 11 other banks. But in 1979, the Federal Reserve ordered Baldwin to relinquish control of the banks. Baldwin transferred its interest to a limited partnership that owns 92.4% of a second partnership that owns 95% of Central Bancorp. The rest of the partnerships are owned by officers of the bank and other investors. The setup allowed Baldwin to divest itself of control but still get income from the banks.

Baldwin also issued a series of debentures, some with warrants that if excercised in 1996 would have stripped Baldwin of its partnership interest. AmeriTrust's purchase of those debentures and warrants, at about 20 cents on the dollar, removes the threat that it will lose ownership of the Colorado banks to the Baldwin debenture holders. Some of the debentures are held by other banks.

Baldwin also had promised to provide $10 million to the holding company in 1983, but didn't because of its financial troubles. AmeriTrust said it will make additional capital contributions to the Colorado banks. "We want to see the banks grow," an AmeriTrust spokeswoman said.

#### 'Nothing Is Clear'

Bank and Baldwin officals avoided contact after the "divestiture." But George B. McKinley, chairman and chief executive officer of the holding company, said the banks are run the same as any others despite the unusual partnership arrangements. "We have directors who get quite anxious if the company isn't doing as well as it could," he says.

In fact, the annual report to shareholders issued by Central Bancorp. doesn't even mention the complicated Baldwin ownership, although documents filed with the Federal Reserve and the Securities and Exchange Commission do.

"As a competitor, I haven't see any evidence that the ownership has caused any problem," said Leo Hill, president and chief executive of Affliated Bankshares of Colorado Inc. He and other bankers said Central Bancorp. has been more active since the Baldwin divestiture.

AmeriTrust had assets of $5.8 billion and Central Bancorp. had assets of $1.7 billion at the end of 1983.

*THE NEW YORK TIMES,*

*SATURDAY, JUNE 23, 1984*

## Ameritrust to Get Baldwin Interest

CLEVELAND, June 22 (Reuters) — The Ameritrust Corporation said it had agreed to assume the Baldwin-United Corporation's limited partnership interest in the Central Colorado Company, a partnership that owns about 95 percent of Central Bancorporation Inc. of Denver. Under the agreement, Ameritrust said it would pay about $105 million to D. H. Baldwin, a Baldwin-United unit, and would surrender substantially all of $154 million in principal amount of Baldwin-United senior term debentures.

Baldwin-United is in Chapter 11 bankruptcy proceedings. Its president, Peter A. Martosella Jr., said the deal "greatly simplifies our reorganization efforts and it is consistent with our plan for the staged disposition of certain operations and assets."

BUSINESSWEEK · JULY 2 1984

**FINANCE**

### AMERITRUST GOES TO COLORADO

AmeriTrust Corp., a Cleveland-based bank holding company with $5.8 billion in assets, has agreed to buy Baldwin-United Corp.'s 89% equity ownership in 19 Colorado banks. AmeriTrust would pay an undisclosed amount for the banks, which have $1.7 billion in assets. AmeriTrust claims that the purchase avoids prohibitions against interstate banking because it is buying out Baldwin's limited partnership in the banks, making the transaction an "investment" rather than a merger. AmeriTrust is seeking approval from holders of Baldwin's debentures, who threw the company into Chapter 11 proceedings in September and who will apparently receive some of the sale's proceeds. AmeriTrust, which has recently slipped from its spot as the largest bank holding company in Ohio, aims to position itself in growth markets when interstate banking is permitted.